WILLIAM LEWIS *vs.* NEW YORK SLEEPING CAR COMPANY.
WILLIAM R. WING *vs.* SAME.

Bristol.    Oct. 28, 1886. — Jan. 7, 1887.    DEVENS & W. ALLEN, JJ., absent.

A sleeping car company is bound to use reasonable care to guard from theft the property of a passenger occupying a berth in a car, and if, through want of such care, such personal effects of a passenger as he may reasonably carry with him are stolen, the company is liable for the loss; and the company cannot avoid its liability by posting in the car a notice disclaiming responsibility for personal property in berths, if the notice is not known to the passenger.

In an action against a sleeping car company for the loss of a passenger's property by theft, the evidence tended to show that the property of two passengers in one car was stolen from their berths during the same night; that the porter of the car was found asleep at an early hour of the morning in a position from which no view could be had of that part of the car in which the passengers were asleep; and that the porter was required to be on duty for thirty-six hours continuously, which included two nights. *Held*, that there was evidence of negligence on the part of the defendant proper to be submitted to the jury.

TWO ACTIONS, each with a count in contract and a count in tort, to recover for the loss of the plaintiff's property, alleged to have been stolen while the plaintiff was riding as a passenger in the defendant's car, through the negligence of the defendant's

servant. The cases were tried together in the Superior Court, before *Thompson*, J., who allowed a bill of exceptions, in substance as follows:

It was agreed that the defendant owned and managed a certain sleeping car, called Pontiac, which was run on the roads of the Boston and Albany Railroad Company, and the New York Central and Hudson River Railroad.

The plaintiff Lewis testified as follows: " I left Boston for San Francisco on October 20, 1884, on the train leaving the Boston and Albany Railroad depot at six P. M. This was a regular train leaving Boston daily with passengers bound for San Francisco. I bought sleeping car tickets of the defendant's agent in the Boston and Albany Railroad depot entitling me to two berths, or one section, on the car Pontiac, between Boston and Chicago. I paid eleven dollars for them. The time from Boston to Chicago is two nights and one day. My section was the one next to the end of the aisle; Wing's was diagonally opposite mine; and two other New Bedford men of our party, all bound to San Francisco, occupied sections adjacent to us. The sections and berths were fitted as sleeping cars usually are. Each section comprised two ordinary seats by day, and at night the seats were converted into a bed, with mattress, pillows, sheets, blankets, and spreads, and with a curtain between it and the aisle. I occupied the whole section, going to bed about eleven o'clock. I took off only my coat, vest, and boots. I folded my vest up, and put it under my pillow, right under my head. In the inside pocket of the vest I had $200 in bills. The pocket was sewed up securely across the top before I left home. I had it sewed up that it might be safe when I went to sleep. I felt the money in the pocket of the vest before I went to sleep after leaving Albany, which was about half past one in the morning. I did not wake until five o'clock, when I got up and dressed, putting on my vest. I then went to the wash-room; the train conductor was in there. I next went into the smoking-room at the end of the car. The smoking-room is so situated that you cannot see the main body of the car from it. The door by which you enter faces the end of the car, and there is no window or opening into the main aisle. When I entered the smoking-room I found the porter, Columbus J. Jones, there. He was lying down with his body

and head on a short seat, and his feet on the floor with a blanket rolled over him. I think he was asleep. I could not swear to it, because I could not see his eyes; it was dark. From the position in which he was lying no view was to be had of the part of the car where the passengers were asleep. When I got up, I saw no officer of the Sleeping Car Company, nor any one except passengers in the part of the car where the passengers were asleep. I did not speak to the porter. He remained quietly in the same position for about fifteen minutes. Then I asked him to make up my section, and he did so. About half-past five, Mr. Wing, one of our party, came into the smoking-room, and said he had been robbed. I examined my vest. I discovered that a slit two or three inches long had been cut in the bottom of the pocket and all the money taken out. When I discovered the loss, I told the porter about it. He said it must have been a man who got off at a place where we stopped at about four o'clock, because the man gave him five dollars. At a stopping place I told the sleeping-car conductor, who called in an official. I told the official I found the fellow asleep. The porter said that he was not asleep, because he talked to the train conductor just before I found him in the smoking-room. I did not see any notice in the wash-room in which the company disclaims responsibility for personal property in berths. It was not light enough in the wash-room for me to read it if I had seen it. I never saw such notices in sleeping cars. There is a seat at the end of the aisle for the porter, in plain sight of the berths. I have seen the porter in the cars of this company occupying that seat when not engaged in making up berths or blacking boots. I have frequently travelled on this route to San Francisco, two to four times a year for ten years, taking a sleeping car each time."

The plaintiff Wing testified as follows: "I accompanied Lewis to California on this trip, on October 20, 1884. I left Boston on the car Pontiac at six o'clock. I went to bed about half-past nine. Awoke once or twice during the night for a moment or so. About six o'clock I got up. In dressing, I discovered that I had lost $150 in bills. The bills had been placed in the interior compartment of a pocket-book. When I went to sleep I put the pocket-book in the inside pocket of my vest, folding the vest twice, and put it under my pillow towards the inside. When I

discovered the loss, I went into the smoking-room and spoke to Lewis. I do not remember seeing any notice in the wash-room in regard to valuables."

It was agreed that (excepting at stations, where the door was locked) the doors at both ends of the car were kept unlocked, and there was no interruption to passage through from one end of the train to the other.

Nathan A. Wheeler testified for the defendant as follows: " I am the eastern division superintendent of the New York Central Sleeping Car Company. I am located in New York, and have charge of every road east of Buffalo that we run over. The price charged to everybody on the sleeping cars is the same, for the same accommodations. No consideration is made in the price in view of the articles or money or valuables which a passenger has. We know nothing about them."

William F. Ray testified as follows: " I was a sleeping car conductor in the employ of the defendant. On the night of October 20, 1884, I took charge of four sleepers on the train which left Albany at 1.35 A. M. The Pontiac was one of them. The porter on the car Pontiac was Columbus J. Jones. He was on duty for the trip from Boston to Chicago, and when I took charge of the cars. The porter is under my control and direction. The duties which he has to perform under my direction are as follows: he has to look out for his car and his passengers, and take care of them, to black the boots, and to stay awake; he has to clean and trim the lamps, make up berths, stand on the platform at stations and receive passengers, see to the washing accommodations, towels, &c., attend to the fires, brush coats, and attend to passengers. In the morning of October 21, I was in the next car to the Pontiac. The porter of the Pontiac came in and called me. I immediately went into the car where Mr. Lewis was. It was in consequence of the porter's coming to me that I went to see Mr. Lewis, who told me of his loss, and of Mr. Wing's. At Rochester I made a statement to the superintendent. I was in the car Pontiac every little while during the night. I saw the porter there. He was blacking boots up to near the time we got to Utica, at the end of the car, where he could see the whole aisle. The last time I went through the car was just after leaving Utica. We left Utica at about a quarter of

six. At no time during the night did I find him in the smoking-room, or asleep, or lying down, or anything of the kind. There were notices about responsibility for valuables at each end of the car, in the gentlemen's and ladies' wash-rooms, directly over the wash-stand. They were similar to the notice in evidence.* The train conductor is my superior. He and the employees of the railroad have free access to the car. The seat on which Lewis testifies he found the porter lying is eighteen inches wide, and not quite so long as a seat in an ordinary day car. The porter's pay is $25 a month. He finds his own board."

It was admitted by the defendant that there was no receptacle for valuables or other property furnished by the defendant, and that its servants were forbidden to take possession of any such articles.

The defendant requested the judge to rule as follows : "1. There is no evidence upon which the jury can find any contract or obligation on the part of the defendant to watch and care for or protect the money of the plaintiff. 2. There is no evidence upon which the jury can find that the loss occurred through the negligence of the defendant. 3. The absence of the porter from the aisle of the car, as testified to by Lewis, is the only evidence of negligence on the part of the defendant; and that evidence is not sufficient to justify a verdict for the plaintiff, the absence being after the loss occurred."

The judge refused to rule as requested, but instructed the jury as follows : " The defendant corporation, in furnishing sleeping cars for the travelling public, is not to be regarded as an innkeeper, or as a common carrier. These are insurers of the property. But it is bound to exercise ordinary care to prevent thefts of goods and money from the person of one to whom it has furnished a berth for hire in the ordinary course of its business, either from unauthorized intruders or by occupants of the car. The company may be liable for such articles as a passenger usually carries about his person, and for such sum of money as may be reasonable and necessary for travelling expenses, providing

---

* This notice requested passengers to take care of their valuables when retiring, and stated that the company would not be responsible for any valuables belonging to passengers.

the same is lost by want of ordinary care on the part of the defendant or its servants in not exercising such care.

"You are to say, under all the circumstances of this case, whether or not the defendant corporation, on the night in question, in the sleeping car Pontiac, exercised ordinary care to protect the persons occupying the berths there from larceny. You will determine what, under the circumstances, would be ordinary care, not extraordinary care; not to keep such a condition of things as to render it impossible for a theft to occur, but taking into consideration the business, the construction of the car, and the situation of the berths; and, on all the facts, you are to say what would be reasonable care. If you find that the defendant did exercise ordinary care, then it is not responsible to the plaintiffs, or either of them. If you find that the defendant did not exercise ordinary care, then you will go further, and ascertain whether the theft was the result of the want of such ordinary care. If you find it was the result of the want of ordinary care on the part of the defendant, and the plaintiffs were themselves in the exercise of due care, then the defendant would be answerable for the whole or such part of the money lost as it was reasonable and necessary for these parties to have, taking them as travellers upon the journey that they were going, and having regard to the ordinary liabilities and expenses contingent upon such a trip."

The jury returned a verdict for the plaintiff in each case; and the defendant alleged exceptions.

*C. W. Clifford & W. Clifford*, for the defendant.

*H. M. Knowlton*, (*A. E. Perry* with him,) for the plaintiffs.

MORTON, C. J. The use of sleeping cars upon railroads is modern, and there are few adjudicated cases as to the extent of the duties and liabilities of the owners of such cars. They must be ascertained by applying to the new condition of things the comprehensive and elastic principles of the common law. When a person buys the right to the use of a berth in a sleeping car, it is entirely clear that the ticket which he receives is not intended to, and does not, express all the terms of the contract into which he enters. Such ticket, like the ordinary railroad ticket, is little more than a symbol intended to show to the agents in charge of the car that the possessor has entered into a contract

with the company owning the car, by which he is entitled to passage in the car named on the ticket.

Ordinarily, the only communication between the parties is, that the passenger buys, and the agent of the car company sells, a ticket between two points; but the contract thereby entered into is implied from the nature and usages of the employment of the company.

A sleeping car company holds itself out to the world as furnishing safe and comfortable cars, and, when it sells a ticket, it impliedly stipulates to do so. It invites passengers to pay for, and make use of, its cars for sleeping, all parties knowing that, during the greater part of the night, the passenger will be asleep, powerless to protect himself or to guard his property. He cannot, like the guest of an inn, by locking the door, guard against danger. He has no right to take any such steps to protect himself in a sleeping car, but, by the necessity of the case, is dependent upon the owners and officers of the car to guard him and the property he has with him from danger from thieves or otherwise.

The law raises the duty on the part of the car company to afford him this protection. While it is not liable as a common carrier or as an innholder, yet it is its duty to use reasonable care to guard the passengers from theft, and if, through want of such care, the personal effects of a passenger such as he might reasonably carry with him are stolen, the company is liable for it. Such a rule is required by public policy, and by the true interests of both the passenger and the company; and the decided weight of authority supports it. *Woodruff Sleeping & Parlor Coach Co.* v. *Diehl*, 84 Ind. 474. *Pullman Car Co.* v. *Gardner*, 3 Penny. 78. *Pullman Palace Car Co.* v. *Gaylord*, 23 Am. Law Reg. (N. S.) 788.

The notice by which the defendant company sought to avoid its liability was not known to the plaintiff, and cannot avail the defendant.

The defendant contends that there was no evidence of negligence on its part. The fact that two larcenies were committed in the manner described in the testimony is itself some evidence of the want of proper watchfulness by the porter of the car; add to this the testimony that the porter was found asleep in the

early morning, that he was required to be on duty for thirty-six hours continuously, which included two nights, and a case is presented which must be submitted to the jury.

We have considered all the questions which have been argued in the two cases before us, and are of opinion that the rulings at the trial were correct.                    *Exceptions overruled.*